1529

Timothy Lane McCUTCHEON, Golda Mae McCutcheon, Bobby Ansel McCutcheon and Margaret Ann Wilson, Appellants, v. CHARLESTON COUNTY DEPARTMENT OF SOCIAL SERVICES, Justine Carole Tedrick and Richard Lee Moutz, Respondents.

(396 S.E. (2d) 115)

Court of Appeals

*William C. Cleveland,* and *Edward D. Buckley,* Charleston, *for appellants.*

*Lee M. Robinson,* Charleston, *Cindy S. McIntee* and *Elizabeth K. Stricklin,* Columbia, *for respondents.*

*A. Elliott Barrow, Jr.,* of Charleston, *for guardian ad litem.*

Heard May 14, 1990.

Decided Aug. 6, 1990.

*Per Curiam:*

This case originated when the paternal grandparents filed a petition for adoption. DSS answered and requested the grandparents petition be denied. In addition DSS asked the court to terminate the parental rights of the biological parents. The foster parents intervened and petitioned for adoption and the termination of the biological parents' parental rights. The trial court terminated the rights of the biological parents and granted the adoption petition of the foster par-

ents. The biological parents and paternal grandparents appeal. We affirm.

## FACTS

On July 30, 1985, a girl, Kimberly Ann McCutcheon (Kimberly), was born to Margaret Ann Wilson (Margaret) and Timothy Lane McCutcheon (Timothy).

On November 14, 1985, the Charleston County Police Department was called to the home of Catherine McCutcheon, Timothy's mother. Tammy McCutcheon, Timothy's sister, and a resident of Catherine McCutcheon's home informed the police that Timothy and Margaret had left Kimberly at Catherine McCutcheon's home without permission and that Kimberly could not remain there. While the police were still at the home, Margaret returned to inform the police that she did not have a residence or any prospects therefor and did not have the ability to care for Kimberly. Kimberly was taken into emergency custody. On November 15, 1985, the Department of Social Services (DSS) petitioned for custody of Kimberly due to neglect. DSS specifically alleged Kimberly was left with relatives, without the relatives' permission, for days without Timothy and/or Margaret identifying their collective or respective whereabouts. In addition DSS alleged the child was unharmed and that Margaret had no place to live.

On December 5, 1985, the court held probable cause existed to take Kimberly into emergency custody and therefore granted custody to DSS.

On February 6, 1986, a hearing on the merits was conducted. The parties, Timothy, Margaret and DSS, agreed that Kimberly had been threatened with harm by Timothy and Margaret. Custody, therefore, remained with DSS. The court ordered Timothy and Margaret to attend and successfully complete Parent Effectiveness Training (PET) classes and find and maintain suitable living arrangements and employment. A homestudy of Bobby and Golda Mae McCutcheon's house was also ordered. This order was to be reviewed upon completion of the homestudy.[1]

On June 11, 1986, Timothy petitioned for permanent cus-

---

[1] This homestudy was never completed, in part, because of the instability of Bobby and Golda Mae McCutcheon's marriage. A subsequent homestudy, related to the adoption proceeding, was completed.

tody of Kimberly. The court found it was not in Kimberly's best interest to return to Timothy, specifically— Timothy had no permanent residence, sporadic employment, pending criminal charges and an unpleasant relationship with Margaret. Margaret did not join in Timothy's petition for a change in custody. The court, finding that Timothy passed his parenting skills class, awarded him visitation every Friday evening from 6:00 p.m. to Sunday evening at 6:00 p.m. The visits were to "take place *in* the home of the parental grandfather and step-grandmother, Bobby and Golda McCutcheon." (Emphasis added.)

On Saturday, June 28, 1986, Timothy, while on a designated visit, took Kimberly to a trailer he and Margaret shared. Mr. McCutcheon became perplexed when he arrived home at 1:00 a.m. and could not find Timothy or Kimberly. Mr. McCutcheon called the police and went to the trailer. After some disagreement Margaret and Timothy allowed Kimberly to be returned to Mr. McCutcheon.

On July 3, 1986, visitation between Timothy, Margaret and Kimberly was suspended. On September 17, 1986, visitation was restored, for one hour a week, subject to DSS supervision, if necessary. Mental health counseling was ordered for Timothy and Margaret.

On March 20, 1987, Bobby and Golda Mae McCutcheon petitioned to adopt Kimberly, pursuant to consent from Timothy and Margaret. On April 10, 1987, Timothy petitioned for longer visitation and permanent custody since he and Margaret were living with his parents again because Margaret had given birth to a second child.

DSS opposed adoption of Kimberly by the McCutcheons and requested the parental rights of Timothy and Margaret be terminated. The foster parents, Richard Moutz and Justine Tedrick, intervened and asked that the petition of Bobby and Golda Mae McCutcheon be denied and the parental rights of Timothy and Margaret be terminated. The foster parents also petitioned for adoption.

The cases for adoption and termination of parental rights were consolidated and heard on January 19 and 20, 1988. The resulting order terminated the parental rights of Timothy and Margaret, denied Bobby and Golda Mae McCutcheon's petition for adoption and granted the adoption petition of the

foster parents. The biological parents appeal and the grandparents appeal. We affirm.

## DISCUSSION

The requirements for becoming a parent are minimal. The requirement to provide for a child a stable and healthy environment demands more than a minimal effort from parents. S.C. Code Ann. § 20-7-1572 (1976) provides:

> The Family Court may order the termination of parental rights upon a finding of one or more of the following grounds:
>
>     *      *      *      *      *      *
>
> (2) The child has been removed from the parent pursuant to § 20-7-736, has been out of the home for a period of six months, and despite a reasonable and meaningful effort by the agency to offer appropriate rehabilitative services, the parent has not remedied the conditions which caused the removal; . . .

Timothy and Margaret argue that the condition which caused Kimberly's removal has been remedied and, in the alternative, if the condition has not been remedied, it is because DSS failed to make a meaningful offer of appropriate rehabilitative services. To analyze their arguments, it is imperative that the condition which led to Kimberly's removal be thoroughly explored. The appealed order provided the condition which threatened Kimberly with harm was the inability of Timothy and/or Margaret to provide a home for the child. This condition is best understood in conjunction with the treatment plan agreed to by Timothy, Margaret and DSS and ordered on February 6, 1986, pursuant to a hearing on the merits on DSS's petition for custody of Kimberly. This order required Timothy and Margaret to attend and successfully complete Parent Effectiveness Training (PET) classes and "find and maintain suitable living arrangements and employment." The court did not define "suitable living arrangements and employment," but it is clear, we find, this language inherently envisioned more than finding a roof and a job. It envisioned a degree of personal stability and responsibility sufficient to eradicate the threat of harm that originally led to

Kimberly's removal. As the facts above indicate, Kimberly was left, uninvited, with relatives for days and perhaps weeks at a time. During these periods Timothy and Margaret would not disclose their whereabouts. It is our finding, therefore, that Kimberly was removed from the custody of Timothy and Margaret not only because of where she was left, but also the very fact that she was left at all. This implicates responsibility as much as it does housing and employment.

As we read § 20-7-1572(2) DSS has essentially three responsibilities. First, DSS must identify the condition that led to the removal of the child. Second, DSS must identify appropriate rehabilitative services, and third, DSS must make a meaningful offer of those services. DSS is not, however, responsible for insuring successful outcomes. In other words, if we read the treatment plan narrowly to require merely that Timothy and Margaret acquire a house and a job, then the services DSS offered were either successful or unnecessary because Timothy and Margaret acquired numerous housing arrangements and jobs. If we read the treatment plan to require Timothy and Margaret to both acquire and retain housing and employment, this implicates stability and responsibility, and DSS is limited in its ability to provide those characteristics. DSS can provide avenues for Timothy and Margaret to demonstrate responsibility, and it did, but DSS cannot bestow these traits on individuals who are unwilling or unable to accept them.

The evidence of record before us clearly and convincingly[2] demonstrates that Timothy and Margaret, as individuals, failed to remove the impediment to their regaining custody of Kimberly. DSS offered appropriate services designed to rehabilitate Timothy and Margaret. Timothy and Margaret took advantage of some services such as their completion of (PET) classes and counseling. Despite this, Timothy and Margaret were unable to develop the responsibility and stability required to comply with the treatment plan.

When Kimberly was removed on November 14, 1985, Timo-

---

[2] *Richberg v. Dawson*, 278 S.C. 356, 296 S.E. (2d) 338 (1982) citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L. Ed. (2d) 599 (1982) for the proposition that clear and convincing evidence is necessary to afford parents due process in terminating their parental rights.

thy was living with his mother and working for a building company. He left this job for reasons he cannot remember and began working for a carwash. Initially, while working for the carwash Timothy and Margaret lived with his father. They then acquired a trailer. This was their first independent residential arrangement of record. They lived in the trailer five months and left because of unpaid bills. Timothy quit his job at the carwash and Margaret and he moved back into Timothy's father's house. Timothy then began working for a construction company. He quit after nine months. He then worked for a furniture store for one month. His last full time job was with a grocery store. He was fired according to his testimony for either missing a day due to illness or wearing clothes his employer objected to. He was fired via his brother and Timothy made no effort to contact his employer for clarifications. Next, Timothy enrolled full time at Trident Technical College to study air conditioning and refrigeration. At the time of the hearing, Timothy was in his second semester. Despite not working, Timothy missed more classes than Trident allows and failed some classes. Timothy currently lives with his brother.

He claims his poor employment history is attributable to employer insensitivity about letting him off work to visit Kimberly. Concomitantly, he argues DSS is at fault for scheduling visitation during his work hours. We find Timothy's employment woes stemmed from three things: his inability to drive due to a suspended license;[3] his numerous appearances in court for matters unrelated to this hearing[4] and, predominantly, his propensity to quit the jobs he did have.

DSS, in addition to offering rehabilitative services, worked with Timothy to provide convenient visitation schedules despite his nomadic lifestyle. Visitation between Timothy and Kimberly originally was to be supervised by DSS. On May 2, 1986, Timothy petitioned for visitation with Kimberly from Friday 7:00 p.m. to Saturday 7:00 p.m. each week because of his work schedule. The resulting court order, dated June 11,

[3] Timothy's privilege to drive was suspended for failure to pay traffic tickets.

[4] Since Kimberly was removed, Timothy has been arrested three times for driving under suspension, twice for shoplifting and once for reckless driving. In addition, he served three days in jail for failure to pay fines on his conviction for passing bad checks.

1986, allowed Timothy to visit with Kimberly from 6:00 p.m. Friday evening to Sunday evening 6:00 p.m. provided the visits took place in the home of Timothy's father. Kimberly's GAL volunteered to transport the child. On Saturday June 28, 1986, Timothy took Kimberly from his father's house to the trailer he shared with Margaret in direct contravention of the visitation arrangement. The police were summoned and a volatile situation was defused.

On July 3, 1986, Timothy's visitation rights were suspended as a result of the events of June 28, 1986.

On September 17, 1986, Timothy's visitation rights with Kimberly were restored. Visitation was to occur in the trailer shared by Timothy and Margaret for one hour per week. This arrangement existed, briefly, until Timothy and Margaret left the trailer without notifying DSS.

In sum, whatever problems Timothy encountered with DSS resulted from the instability of his own circumstances. DSS, we find, was more than accommodating in its efforts to allow visitation including arranging meetings at a local mall because Timothy and Margaret had little predictability in their housing arrangements.

We find, by clear and convincing evidence, that Timothy did not eradicate the condition(s) that resulted in Kimberly's removal. Despite the services and assistance of DSS, Timothy failed to secure stability in his housing or employment.

Margaret was not present during the first day of the hearing. On the second day she was absent from the courtroom for several hours. For this reason, in part, it is difficult to determine exactly what Margaret has been doing since Kimberly was removed. What evidence does exist clearly and convincingly establishes that Margaret has failed to rectify the condition(s) that led to Kimberly's removal.

During the two years and two months that elapsed from the time Kimberly was removed until the hearing involved in this appeal Margaret never secured stable employment or housing. During the time DSS worker Mack Magee was involved with this case, approximately three months, the longest period of time Margaret was employed was a week. In January of 1987, Carolyn Hudson, became involved with

Margaret. Ms. Hudson testified that Margaret worked for a restaurant for two weeks but aside from that was not employed.

Margaret argues her lack of employment is attributable to DSS's failure to assist her. We do not agree. The record shows Margaret is capable of securing employment, but, like Timothy, she has difficulty retaining employment. Section 20-7-1752(2) requires DSS to offer rehabilitative services to Margaret, but it does not require DSS to seek out employment, go on interviews and ultimately work for Margaret. As the facts indicate Margaret absented herself from the hearing to interview for a job so it is clear she is familiar with the employment process. She, as the treatment plan envisioned, must bear the ultimate responsibility for obtaining and retaining suitable employment. Inasmuch as she has not, she failed to eradicate the condition which led to Kimberly's removal.

Margaret was itinerant and unpredictable in her housing arrangements. As noted above, she and Timothy briefly shared a trailer until leaving due to their inability to pay their bills. She lived in an apartment at one time until being evicted. She is currently facing eviction from another housing arrangement due to unruly behavior. The record indicates offers of assistance from, among others, Margaret's mental health counselor in helping her obtain housing.

We find that Margaret, despite rehabilitative services offered by DSS, failed to secure housing or employment sufficient to eliminate the threat of harm to Kimberly that existed when she was originally removed.

The decision to terminate her parental rights is supported by the clear and convincing evidence of record and therefore affirmed.

## ADOPTION PROCEEDING

Subsequent to the hearing on a termination of Timothy and Margaret's parental rights, the court heard petitions for adoption from the paternal grandparents, Bobby and Golda Mae McCutcheon, and the foster parents, Richard Moutz and Justine Tedrick.

In every adoption proceeding, the best interest of the child is the paramount consideration. *Chandler v. Merrell*, 291 S.C. 227, 353 S.E. (2d) 135 (1987). The court found Kimberly's best interests would be served by granting the foster parents' petition. We affirm.

Kimberly was placed with the foster parents when she was less than four months old. At the time of the hearing, she was two and a half years old. The overwhelming evidence of record is that Kimberly has bonded with the foster parents as well as with her foster siblings. The evidence indicates that Kimberly views Mr. Moutz and Ms. Tedrick as her parents. Mr. Moutz and Ms. Tedrick were married on February 26, 1977. They have two children, Elizabeth and Lailia, aged ten and seven respectively at the time of the hearing.

A child psychiatrist, a marriage and family therapist and Kimberly's GAL testified, without reservation, that Mr. Moutz and Ms. Tedrick were capable parents who provided a stable[5] home with an appropriate mixture of love and discipline.

The McCutcheons, as grandparents, are not entitled to any preferences. *Dunn v. Dunn*, 298 S.C. 365, 380 S.E. (2d) 836 (1989). Their status, as blood relatives, is but one factor in determining the child's best interests. *Kemry v. Fox*, 273 S.C. 268, 255 S.E. (2d) 836 (1979).

While the judge did not find the McCutcheon home unsuitable, he determined Kimberly's best interests would be served by staying with the family she has known as such for nearly all her life. We agree.

## CONCLUSION

In equity cases, we may find facts in accordance with our own view of the evidence. We are mindful that the evidentiary standard is higher in this case due to the vital interests at stake. After a thorough review of the record, we find § 20-7-1572(2) was complied with by DSS and the termination of Timothy and Margaret's parental rights is therefore affirmed.

---

[5] A homestudy was conducted and the Moutz/Tedrick home was found to be in Kimberly's best interest.

In addition, we find Kimberly's best interests would be served by granting the foster parents' adoption petition.

Affirmed.

