# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

South Carolina Department of Social Services,
Respondent,

and

Sherry Powers, Edward Anthony Dalsing and Tammy
Gaye Causey Dalsing, Intervenors,

of whom Edward Anthony Dalsing and Tammy Gaye
Causey Dalsing, are Petitioners,

v.

Erica Smith and Andrew Jack Myers, Respondents.

In the interest of a minor under the age of eighteen.

Appellate Case No. 2017-000784

————————

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

————————

Appeal from Union County
Rochelle Y. Conits, Family Court Judge

————————

Opinion No. 27797
Heard October 19, 2017 – Filed May 9, 2018

————————

## REVERSED

————————

James Fletcher Thompson, of James Fletcher Thompson, LLC, of Spartanburg; and Larry Dale Dove, of Dove Law Group, LLC, of Rock Hill, for Petitioners.

Melinda Inman Butler, of The Butler Law Firm, of Union; Debra A. Matthews, of Debra A. Matthews, Attorney at Law, LLC, and Carol Ann Tolen, of Coleman & Tolen, LLC, both of Winnsboro; David E. Simpson, of Rock Hill, and Shawn L. Reeves, of Columbia, both of South Carolina Department of Social Services; all for Respondents.

Allison Boyd Bullard, of Harling & West, LLC, of Lexington, for Amici Curiae Law Professors and Lecturers James Dwyer, Paulo Barrozo, Elizabeth Bartholet, J. Herbie Difonzo, Jennifer Drobac, Crisanne Hazen, Jennifer Mertus, Deborah Paruch, Iris Sunshine, Lois A. Weithorn, and Crystal Welch.

---

**JUSTICE JAMES:** In this matter, Petitioners Edward and Tammy Dalsing (Foster Parents) are seeking to adopt a young girl (Child). Foster Parents' private action for termination of parental rights (TPR) and adoption was consolidated with the South Carolina Department of Social Services' removal action against Erica Smith (Mother) and Andrew Myers (Father). At the final hearing, the family court (1) adopted the permanent plan of TPR and adoption; (2) terminated Mother's parental rights; (3) found Father was not a person whose consent was required for Child's adoption, but as a further sustaining ground, terminated Father's parental rights; and (4) granted Foster Parents' petition for adoption. Father appealed, and the court of appeals vacated in part, reversed in part, and remanded the case to the family court for a new permanency planning hearing. *S.C. Dep't of Soc. Servs. v. Smith*, 419 S.C. 301, 797 S.E.2d 740 (Ct. App. 2017). This Court granted certiorari to review the court of appeals' decision. For the reasons discussed below, we reverse the court of appeals and reinstate the family court's grant of adoption to Foster Parents.

## STANDARD OF REVIEW

On appeal from a matter in the family court, this Court reviews factual and legal issues de novo. *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). Although

this Court reviews the family court's factual findings de novo, we are not required to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lewis*, 392 S.C. at 385, 709 S.E.2d at 652. Also, "*de novo* review neither relieves an appellant of demonstrating error nor requires us to ignore the findings of the family court." *Id*. at 389, 709 S.E.2d at 654. Because of our de novo standard of review, we will undertake a detailed review of both the facts of this case and its tortuous procedural history.

## FACTUAL AND PROCEDURAL HISTORY

Mother and Father were living together, unmarried, at the time Child was conceived in 2012. Mother has a long history of drug addiction and instability, and Father has a troubled history as a teenager and young adult, which includes the use of illegal drugs and other criminal activity. Mother and Father did not have stable housing, and Mother was working to pay the bills at the time Child was conceived. In October 2012, a week or two after learning about the pregnancy, Father voluntarily surrendered to Maryland authorities on outstanding criminal charges. Mother testified she and Father discussed Father's outstanding charges and decided Father should surrender to authorities to timely serve his sentence in order for him to assist Mother in raising Child upon his release. Father remained incarcerated in Maryland until June 2013, when he was transferred to a penal facility in Virginia to serve even more prison time for two contempt of court charges; two fraud, bank notes, or coins charges; and one probation violation. At the time of the final family court hearing in 2015, Father's expected release date was November 1, 2016.

Mother testified that after Father went to prison, "I was just bouncing from here to there, [living] wherever I could." Around Thanksgiving 2012, Mother contacted Sherry Powers (Grandmother),[1] who lived in Virginia, and asked if Grandmother could pick her up in South Carolina. Mother was approximately three months pregnant at the time. Grandmother testified Mother called and asked her to come pick her up because Mother had been beaten up, had been in the hospital, and had nowhere to go. Grandmother and Step-Grandfather (collectively, Grandparents) picked up Mother in South Carolina and took her to Virginia to live with them.

---

[1] Grandmother is Father's mother. Both paternal grandparents were initially parties in this action; however, Eric Powers, paternal step-grandfather (Step-Grandfather), was dismissed as a party after he and Grandmother separated.

Mother lived with Grandparents for approximately four months. During this time, Grandmother provided food, shelter, transportation, and support for Mother. Grandmother purchased items in anticipation of Child's birth and attended Mother's prenatal appointments. Grandmother testified she provided these items for Child on Father's behalf. Grandmother believed that after Child's birth, Child was going to live in her house. Father never sent Mother or Grandmother any money in anticipation of Child's birth. However, according to Mother, Father "frequently" contacted her via phone calls and letters during the time she was living with Grandparents.

In late March or early April 2013—prior to Child's birth—Mother left Grandparents' home, taking some of the items Grandmother purchased for Child. Mother testified she left Grandparents' home after Step-Grandfather made sexual advances toward her on more than one occasion. Mother went to live with her father in South Carolina. Within a week of her moving, Father called and sent Mother a letter. Mother testified that following her receipt of Father's phone call and letter, she never received another call, letter, or offer of support from him. Mother testified she ended her relationship with Father around the time she left Virginia but noted she never prohibited Father from contacting her.

Mother gave birth to Child in South Carolina on May 15, 2013. Grandparents were present and brought the remaining items they had purchased for Child. Mother tested positive for opiates and amphetamines at Child's birth; however, because Child's meconium drug screen was inconclusive, Mother was permitted to take Child home. On May 31, 2013, Child was given a hair strand drug screen, and Child tested positive for cocaine and benzoylecgonine (the main metabolite of cocaine).

On June 6, 2013, law enforcement took emergency protective custody of Child. On the same day, the South Carolina Department of Social Services (DSS) placed her in foster care with Foster Parents and filed an action for removal against Mother and Father. DSS's Affidavit of Reasonable Efforts accompanying its removal complaint noted Mother informed DSS that she did not want Child placed with Grandmother. A probable cause hearing was held on June 10, 2013, and the family court found probable cause for Child's removal and for DSS to assume legal custody of Child. Grandmother testified she was surprised to hear Child was removed and placed in foster care because she thought DSS would have contacted her first. She explained she had previously contacted DSS and sought Child's placement in her home. However, because Grandparents lived in Virginia,

Grandparents were required to complete a home study pursuant to the Interstate Compact on the Placement of Children (ICPC).[2]

At the June 19, 2013 merits hearing, the matter was continued; however, the family court ordered an ICPC home study for Grandparents. The family court also ordered a paternity test for Father and permitted him to file and serve an affidavit attesting he was Child's natural father. On June 27, 2013, Father executed an affidavit acknowledging paternity indicating he was aware of Child's birth and his responsibility to support Child. A September 2013 DNA paternity test confirmed Father's paternity. Grandmother scheduled and paid for the test.

At the required merits hearing on July 18, 2013, the family court adopted the agreement of the parties and made a finding of physical abuse against Mother. The family court's order from the merits hearing—signed August 13, 2013—again ordered an ICPC home study for Grandparents[3] and required Father's child support obligation be held in abeyance, referencing Father's incarceration. On August 20, 2013, Grandparents filed a motion to intervene in DSS's action and sought custody of Child; their motion to intervene was granted in November 2013. Additionally, on August 20, 2013, Grandmother filed an answer, counterclaim, and crossclaim in DSS's action, alleging neither Mother nor Father were "*capable, suitable, fit, or proper persons to be granted custody of Child*." (emphasis added).

On November 8, 2013, Mother signed a consent and relinquishment of her parental rights, specifying Foster Parents as her desired adoptive parents for Child. Foster Parents filed a private TPR and adoption action on November 19, 2013. In their complaint, Foster Parents alleged Father was Child's natural father and that he was not a person from whom consent was required under section 63-9-310(A) of the South Carolina Code (2010). In December 2013, Father—still in prison—filed an

---

[2] *See* S.C. Code Ann. § 63-9-2200 (2010) (enacting the ICPC into law to ensure placements for children across state lines are safe).

[3] Stacie Eison, a DSS treatment worker and investigator, testified DSS delayed the start of the ICPC home study because it was waiting on the signed family court orders and results of Father's paternity test. Eison also testified she was unfamiliar with the ICPC process and explained it took her some time to complete the required paperwork. Eison testified the ICPC was not completed and submitted by DSS until October 29, 2013. She believed that if Grandmother had resided in South Carolina, Child would have been placed in Grandmother's custody. Eison testified Grandmother never received a negative ICPC home study.

answer contesting Child's adoption by Foster Parents, contesting his TPR, and seeking Child's placement with Grandmother.

In January 2014, Foster Parents filed a motion to intervene and requested dismissal of DSS's action against Mother and Father. Alternatively, Foster Parents asked the family court to change Child's permanent plan to TPR and adoption—identifying themselves as Child's adoptive resource. At the January 8, 2014 hearing, the family court granted shared legal custody of Child to DSS and Foster Parents and granted physical custody of Child to Foster Parents, pending a determination of Father's rights to Child. The family court also consolidated Foster Parents' private action with DSS's action.

In their February 10, 2014 amended complaint, Foster Parents alleged (1) Father had not established parental rights in and to Child pursuant to section 63-9-310(A)(4) of the South Carolina Code, thereby rendering unnecessary his consent to Child's adoption and (2) even if Father had established parental rights, statutory grounds for TPR existed, and TPR was in Child's best interest. Father's answer to Foster Parents' amended complaint was filed on March 12, 2014, objecting to Foster Parents' adoption of Child. On April 9, 2014, Grandparents filed an answer and counterclaim as Intervenors, alleging Foster Parents were not entitled to relief and seeking to adopt Child with Father's consent and Mother's TPR.

On May 2, 2014—almost an entire year after Child was placed with Foster Parents and well into the litigation of this case—Father sent a letter to DSS stating he was unable to visit Child until she was in Grandmother's custody. In the letter, Father explained he asked Grandmother to stop sending him $50 per month for food and to use the money for Child's needs. Father wrote, "I would love nothing more than to see [Child]." Father asked for Foster Parents' phone number so he could call Child. Grandmother admitted Father never paid money for Child's support; however, she confirmed Father directed her in or around May 2014 to stop sending him "food packages" each month and to use the money for Child. Grandmother has consistently traveled from Virginia to South Carolina to visit Child during DSS scheduled visitations, bringing supplies for Child when she visited.

On May 8, 2014, only a few days after Father wrote to DSS, Father wrote a letter to his attorney and enclosed a birthday card for Child. Father's attorney forwarded this card to DSS. Stephanie Kitchens, Child's Guardian ad Litem (GAL), testified she sent Father a "questionnaire-type letter" a couple of months before the July 31, 2014 hearing, and Father responded within a week.

On July 31, 2014, Judge David G. Guyton convened a hearing in Foster Parents' action to determine whether Father was a person who established or maintained parental rights to the extent his consent for Child's adoption was required pursuant to section 63-9-310(A).  Although Judge Guyton issued an order finding Father's consent was not necessary for Child's adoption and noting that even if his consent was required, TPR was appropriate, his order was vacated by this Court because, between the time Judge Guyton held his hearing on July 31, 2014, and issued his order on October 7, 2014, former Chief Justice Toal issued an order consolidating the actions and vesting Judge Michelle M. Hurley with exclusive jurisdiction to hear the consolidated cases.

On October 2, 2014, Father signed a consent for Child's adoption by Grandparents.  At the end of October 2014, Foster Parents received a certified letter from DSS informing them that DSS intended to remove Child from their home and place her with Grandparents.  Subsequently, Foster Parents served DSS and the DSS Appeals Unit with their Notice of Appeal of DSS's decision to remove Child from their home.  At the February 20, 2015 permanency planning hearing, Judge Hurley ordered a permanent plan of relative placement concurrent with TPR and adoption to maintain the status quo during the pendency of any appeals.

On April 23, 2015, former Chief Justice Toal issued an order vesting Judge Rochelle Y. Conits with exclusive jurisdiction to hear and dispose of all of the consolidated cases.  At the June 4, 2015 pretrial hearing, DSS explained "that if [Grandparents] and [Foster Parents were] both seeking adoption, then DSS would not oppose the plan of adoption with either of them."  Step-Grandfather was dismissed as a party to the actions because of his recent separation from Grandmother.

The consolidated cases were tried in July 2015.  The family court permitted Foster Parents and Grandmother to intervene in the DSS action and allowed Father and Grandmother to intervene in Foster Parents' action.  The deposition of First Sergeant Lori Mabry, a records custodian for New River Valley Regional Jail in Dublin, Virginia, was admitted into evidence by consent.  Mabry testified Father was incarcerated at New River Jail from June 11, 2013 until May 14, 2014, when he was moved to Nottoway Correctional Center.  She testified that during the time Father was incarcerated in New River Jail, a total of $1,894.98 was deposited into his commissary account.  Mabry noted that even though Father was able to use these funds for child support, $557 of the funds were used to place phone calls and $1,284.05 of the funds were used to purchase commissary items such as food, clothing, hygiene items, stationery, and stamps.  No funds were expended from his

account for child support. Mabry also described several disciplinary incidents involving Father during his time at New River Jail.

By order dated September 1, 2015, the family court: (1) adopted a permanent plan of TPR and adoption; (2) terminated Mother's parental rights; (3) found Father was not a person whose consent was required for Child's adoption, but as a further sustaining ground, terminated Father's parental rights;[4] and (4) granted Foster Parents' petition for adoption. Father appealed, and the court of appeals vacated in part, reversed in part, and remanded the case to the family court. *S.C. Dep't of Soc. Servs. v. Smith*, 419 S.C. 301, 797 S.E.2d 740 (Ct. App. 2017).

The court of appeals held the family court erred in granting Foster Parents' petition for adoption because the family court had ruled Foster Parents did not have standing to pursue a private adoption action. The court of appeals held that since Foster Parents did not appeal the family court's ruling that they lacked standing to file their adoption action, this unappealed ruling became the law of the case. The court of appeals further ruled the family court properly found Foster Parents lacked standing to file a private adoption petition under the rationale of *Youngblood v. South Carolina Department of Social Services*, 402 S.C. 311, 741 S.E.2d 515 (2013). The court of appeals also ruled that because the issue of Father's consent to adopt was tied to Child's adoption, the issue of consent was not properly before the family court. Thus, the court of appeals vacated both the family court's finding that Father's consent was not required for the adoption and the family court's order granting Foster Parents' adoption of Child.

Additionally, the court of appeals ruled the family court erred in terminating Father's parental rights, finding Foster Parents failed to prove by clear and convincing evidence a statutory ground for TPR existed. The court of appeals found the record did not contain clear and convincing evidence to show that Father abandoned Child, willfully failed to visit Child, or willfully failed to support Child. The court of appeals remanded the matter to the family court for a new permanency planning hearing.

This Court granted Foster Parents' petition for a writ of certiorari to review: (1) whether the court of appeals erred in reversing the family court's order terminating Father's parental rights on the statutory grounds of abandonment and

---

[4] In terminating Father's parental rights, the family court found Father: (1) willfully failed to support Child; (2) willfully failed to visit Child; and (3) abandoned Child. The family court also found TPR was in Child's best interest.

willful failure to visit;[5] (2) whether, if the court of appeals did so err, the family court properly found termination of Father's parental rights was in Child's best interest; and (3) whether the court of appeals erred in holding the family court had no authority to determine any adoption issues because it found Foster Parents lacked standing to bring the private adoption action.

## DISCUSSION

### I.  TPR

The United States Constitution requires fundamentally fair procedures when the State seeks to sever the relationship between a natural parent and their child. U.S. CONST. amend. XIV, § 1; *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982). In *Santosky*, the United States Supreme Court provided:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.  Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. . . . When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

455 U.S. at 753–54.

In South Carolina, the family court may order TPR upon finding one or more of twelve statutory grounds is satisfied and upon finding TPR is in the best interest of the child.  S.C. Code Ann. § 63-7-2570 (Supp. 2017).  The South Carolina Children's Code provides the TPR statute "must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the custody and

---

[5] This Court did not grant certiorari to review the statutory ground of willful failure to support.  *See* S.C. Code Ann. § 63-7-2570(4) (Supp. 2017) (stating a statutory ground for TPR is met when "[t]he child has lived outside the home of either parent for a period of six months, and during that time the parent has wilfully failed to support the child" because the parent failed to make a material contribution in money or necessities).

control of their parents by terminating the parent-child relationship." S.C. Code Ann. § 63-7-2620 (2010).

In TPR cases, there are often two competing interests: those of a parent and those of a child. *S.C. Dep't of Soc. Servs. v. Cochran*, 364 S.C. 621, 626, 614 S.E.2d 642, 645 (2005). "Parents have a fundamental interest in the care, custody, and management of their children. Parental rights warrant vigilant protection under the law and due process mandates a fundamentally fair procedure when the state seeks to terminate the parent-child relationship." *Id.* "However, a child has a fundamental interest in [TPR] if the parent-child relationship inhibits establishing secure, stable, and continuous relationships found in a home with proper parental care. In balancing these interests, the best interest of the child is paramount to that of the parent." *Id.* at 626–27, 614 S.E.2d at 645.

In the instant case, Child was removed from Mother's care a few weeks after birth and was placed in Foster Parents' home on June 6, 2013, after Child tested positive for cocaine and benzoylecgonine. Father was incarcerated out-of-state at the time Child was removed. On November 8, 2013, Mother signed a consent and relinquishment of her parental rights and expressed her desire for Foster Parents to adopt Child. Subsequently, on November 19, 2013, Foster Parents brought a private action seeking TPR and adoption. Even if Foster Parents did not have standing to bring their private adoption action, it was well within Foster Parents' statutory right to file their TPR action. *See* S.C. Code Ann. § 63-7-2530(A) (Supp. 2017) (providing "any interested party" may file a TPR petition); S.C. Code Ann. § 63-7-20(17) (Supp. 2017) (including a foster parent as a "[p]arty in interest"); *Dep't of Soc. Servs. v. Pritchett*, 296 S.C. 517, 520–21, 374 S.E.2d 500, 501–02 (Ct. App. 1988) (concluding the Children's Code provides a foster parent standing to petition for TPR). Because it is well-settled that Foster Parents have standing to petition for TPR, we first address the court of appeals' decision to reverse the family court's termination of Father's parental rights.

### A. Statutory Grounds

The grounds for TPR must be proven by clear and convincing evidence. *S.C. Dep't of Soc. Servs. v. Headden*, 354 S.C. 602, 608, 582 S.E.2d 419, 423 (2003). "On appeal, pursuant to its de novo standard of review, the Court can make its own determination from the record of whether the grounds for termination are supported by clear and convincing evidence." *Broom v. Jennifer J.*, 403 S.C. 96, 111, 742 S.E.2d 382, 389 (2013).

## 1.  Abandonment

Foster Parents argue the family court correctly held Father's parental rights should be terminated for abandoning Child.  We agree.

A statutory ground for TPR is met when the child has been abandoned.  S.C. Code Ann. § 63-7-2570(7) (Supp. 2017).  "'Abandonment of a child' means a parent or guardian wilfully deserts a child or wilfully surrenders physical possession of a child without making adequate arrangements for the child's needs or the continuing care of the child."  S.C. Code Ann. § 63-7-20(1) (Supp. 2017).  Willfulness is a question of intent which requires an analysis of the facts and circumstances of each case.  *S.C. Dep't of Soc. Servs. v. Broome*, 307 S.C. 48, 52, 413 S.E.2d 835, 838 (1992).  "Conduct of the parent [that] evinces a settled purpose to forgo parental duties may fairly be characterized as 'willful' because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent."  *Id.* at 53, 413 S.E.2d at 839.  In considering whether a parent's conduct was willful, the family court may consider all relevant conduct by the parent and is not limited to considering only the months immediately preceding TPR.  *Headden*, 354 S.C. at 611, 582 S.E.2d at 424.  The element of willfulness must be established by clear and convincing evidence.  *Broome*, 307 S.C. at 52, 413 S.E.2d at 838.

"Terminating the parental rights of an incarcerated parent requires consideration of all of the surrounding facts and circumstances in the determination of wilfulness.  The voluntary pursuit of lawless behavior is one factor which may be considered, but generally is not determinative."  *S.C. Dep't of Soc. Servs. v. Wilson*, 344 S.C. 332, 340, 543 S.E.2d 580, 584 (Ct. App. 2001).  "[I]ncarceration alone is insufficient to justify [TPR]."  *S.C. Dep't of Soc. Servs. v. Ledford*, 357 S.C. 371, 376, 593 S.E.2d 175, 177 (Ct. App. 2004).  In *Ledford*, the court of appeals found Ledford, an incarcerated father, abandoned his child because "[i]n addition to 'breathing oxygen,' [Ledford] was required to take the necessary steps to assure that his daughter was being continually cared for."  *Id.*  The court of appeals noted that aside from unsuccessfully sending a birthday card to child, Ledford admitted he only attempted to locate his daughter one time.  *Id.*  The court of appeals found Ledford "neither made arrangements for his child's care nor showed concern for the status of her current arrangements."  *Id.*

Here, the family court found Father abandoned Child "by and through his omission to make any arrangement whatsoever for [Child]'s needs or the continuing care of [Child] prior to reporting to prison."  The family court found Father knew of Mother's "long history of drug abuse and instability, yet he left his unborn child at

the mercy of this dysfunctional person."  However, the court of appeals disagreed, finding the family court erred in finding Father abandoned Child because Father: (1) voluntarily started his prison sentence early; (2) sent a letter to DSS expressing his desire to visit Child; (3) asked DSS for Foster Parents' phone number to call Child; (4) asked Grandmother to use $50 per month to support Child instead of sending it to him in prison; (5) asked his attorney for an update on the case; (6) voluntarily signed an affidavit acknowledging paternity; (7) obtained a DNA test to prove paternity despite DSS failing to assist with the test; (8) sent a letter to the GAL seeking to pursue a relationship with Child; (9) completed and returned a questionnaire from the GAL within one week, and (10) sent Child a birthday card expressing his love.  Although the court of appeals' list of actions taken by Father may appear sufficient to find clear and convincing evidence did not support this statutory ground for TPR, a close analysis of the record reveals otherwise.  Several of the actions listed separately by the court of appeals were not actually separate and distinct actions, but rather occurred within a month's time of one another, and approximately one year *after* Child's birth.

We find the record contains clear and convincing evidence that Father abandoned Child.  Father emphasizes that he voluntarily turned himself in to Maryland authorities so he could plead guilty to outstanding Maryland charges, serve his prison sentence, and then begin his life with Mother and Child.  Of course, after completing the Maryland sentence in 2013, Father was transported back to Virginia to serve prison time for two contempt of court charges, two financial crimes, and a probation violation.  While some may consider admirable Father's efforts to put his troubles behind him, the fact remains that Father was a "wanted man" in both Virginia and Maryland.  We are not inclined to give him credit for voluntarily surrendering his status as a fugitive from justice, as it was incumbent upon him to do so.  Even if Father were entitled to some dispensation from this Court for surrendering to Maryland authorities, he did nothing to prepare for and provide the proper care of Mother and Child during his period of incarceration.  *See Ledford*, 357 S.C. at 376, 593 S.E.2d at 177 (finding evidence that an incarcerated father abandoned his child because he failed to take the necessary steps to ensure his daughter was being *continually* cared for).  When Mother was asked where she lived after Father went to prison, Mother replied, "I was just bouncing from here to there, wherever I could."  Mother had a history of drug abuse and instability; nevertheless, Father left pregnant Mother without money or evidence of a plan for her or Child's well-being.  Further, Father had money in his prison account but did not send any

money for Mother's prenatal care or Child's care following her birth.[6]  Even though Grandmother provided for Mother for several months while Mother was pregnant, it was *Mother* who reached out to Grandmother for assistance—not *Father*.  Mother called and asked Grandmother to come pick her up because Mother had been beaten up, had been in the hospital, and had nowhere to go.

Further, Father's belated efforts to establish contact with Child in May 2014 were only a miniscule attempt to remain a part of Child's life.  *See Ledford*, 357 S.C. at 376, 593 S.E.2d at 177 (finding there was evidence an incarcerated father abandoned his child when he "made only a miniscule attempt to remain a part of his daughter's life").  Despite his incarceration throughout this litigation, Father had the ability to place phone calls and write letters.  Father demonstrated this ability by calling and writing Mother up until approximately one month before Child's birth.  However, after Mother broke off her relationship with Father prior to Child's birth, there is no evidence Father ever placed a phone call to Mother, DSS, or Foster Parents to inquire about Child.[7]  However, the record does indicate that Father spent over $557 on other phone calls during the first year of Child's life.

It was not until May 2, 2014—almost an entire year after Child's birth and several months after litigation had commenced—when Father finally wrote a letter to DSS: (1) explaining he was unable to visit Child until she was placed in Grandmother's custody, (2) noting he would like to see Child, (3) explaining he directed Grandmother to stop sending him $50 per month for food and to use the money for Child's needs, and (4) asking for Foster Parents' phone number to speak with Child.[8]  A few days later on May 8, 2014, Father sent a letter to his attorney

---

[6] We acknowledge the family court's order signed August 13, 2013, held Father's child support obligation in abeyance; however, no monetary support was paid to Mother by Father during her pregnancy and during the three months following Child's birth.  The record indicates that between June 12, 2013, and August 13, 2013, Father's prison accounts received deposits of $264.98, $97.00, and $100.00.  None of this money was sent for Child's care.  Father's earlier prison account records are not included in the record.

[7] Mother testified that after she broke up with Father, she did not prohibit Father from contacting her.

[8] The record does not indicate Father was given Foster Parents' phone number. However, the record does indicate Grandmother had Foster Parents' phone number. At oral argument, DSS admitted Father *could have* and *should have* obtained Foster

inquiring about possible court dates and enclosing a birthday card for Child. There is no evidence in the record explaining why Father failed to reach out to Child sooner, and there is no evidence in the record that Father made any other attempts to contact Child prior to the family court's final hearing in July 2015.

We find additional clear and convincing evidence of Father's abandonment of Child through his relinquishment of his parental rights in conjunction with his October 2, 2014 consent to Grandparents adopting Child. Although Father argues this was a tactical move for him to maintain a relationship with Child, this maneuver clearly and convincingly establishes Father's settled purpose to forgo his parental duties. *See Broome*, 307 S.C. at 53, 413 S.E.2d at 839 (providing "[c]onduct of the parent [that] evinces a settled purpose to forgo parental duties may fairly be characterized as 'willful'"). By relinquishing his parental rights in his consent for Grandparents to adopt Child, Father confirmed he had considered the alternatives to placing Child for adoption and believed adoption was in Child's best interest. There is no evidence in the record that Father has ever sought to withdraw his consent. We find clear and convincing evidence supports a finding that TPR is appropriate on the ground of abandonment.

## 2. Failure to Visit

Foster Parents argue the family court correctly held Father's parental rights should be terminated for willfully failing to visit Child. We agree.

A statutory ground for TPR is satisfied when:

> The child has lived outside the home of either parent for a period of six months, and during that time the parent has wilfully failed to visit the child. The court may attach little or no weight to incidental visitations, but it must be shown that the parent was not prevented from visiting by the party having custody or by court order. The distance of child's placement from the parent's home must be taken into consideration when determining the ability to visit.

S.C. Code Ann. § 63-7-2570(3) (Supp. 2017). Here, it is clear Child has "lived outside the home of either parent" for much longer than six months as she was

---

Parents' phone number from Grandmother. DSS acknowledged Father "should have done more."

removed from Mother's home on June 6, 2013. Child has not since been returned to live with Mother or Father. Thus, the narrow question before this Court is whether there is clear and convincing evidence Father willfully failed to visit Child.

"Whether a parent's failure to visit . . . a child is 'willful' within the meaning of the statute is a question of intent to be determined in each case from all the facts and circumstances." *Broome*, 307 S.C. at 52, 413 S.E.2d at 838. "Conduct of the parent [that] evinces a settled purpose to forego parental duties may fairly be characterized as 'willful' because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent." *Id.* at 53, 413 S.E.2d at 839. "Willfulness does not mean that the parent must have some ill-intent towards the child or a conscious desire not to visit; it only means that the parent must not have visited due to [his] own decisions, rather than being prevented from doing so by someone else." *Broom*, 403 S.C. at 114, 742 S.E.2d at 391.

Here, the family court found Father willfully failed to visit Child for six months and was not prevented from visiting or having meaningful interaction with Child by DSS and Foster Parents. The family court found Father's incarceration was the result of his own willful misconduct and determined Father's conduct indicated he failed to take advantage of his ability to initiate and have contact with Child, DSS, or Foster Parents. The family court noted the few actions that were taken by Father demonstrated both his ability to initiate and have contact with Child and Foster Parents, as well as his failure to do so in a timely manner.

The court of appeals disagreed, finding there was not clear and convincing evidence that Father willfully failed to visit Child. The court of appeals noted Father: (1) voluntarily started his prison sentence early; (2) sent a letter to DSS expressing his desire to visit Child; (3) asked DSS for Foster Parents' phone number to call Child; (4) asked his attorney for an update on the case; (5) voluntarily signed an affidavit acknowledging paternity; (6) obtained a DNA test to prove paternity despite DSS failing to assist with the test; (7) sent a letter to the GAL seeking to pursue a relationship with Child; (8) completed and returned a questionnaire from the GAL within one week; and (9) sent Child a birthday card expressing his love.[9]

_____

[9] Again, although the court of appeals' list of actions taken by Father may appear sufficient to find clear and convincing evidence did not support this statutory ground for TPR, a close analysis of the record reveals otherwise. Several of the actions listed separately by the court of appeals are not actually separate and distinct actions, but rather occurred within a month's time of one another, approximately one year after Child's birth.

Also, the court of appeals noted Eison's testimony that DSS would not have allowed Child to visit Father because he was imprisoned in another state and further noted there was no evidence in the record that DSS ever provided Father with Foster Parents' phone number. Further, the court of appeals found Father repeatedly expressed his desire for Child to be placed with Grandmother so she could facilitate visitation and communication with Child. The court of appeals stated, "[If not] for Foster Parents' administrative appeal, DSS could have placed Child with Grandmother in November 2014, which would have facilitated visitation and communication between Father and Child."

We find clear and convincing evidence establishes Father willfully failed to visit Child. Father's unlawful conduct contributing to his incarceration is a factor that must be considered by this Court when determining whether he willfully failed to visit Child; however, we choose to not give it substantial weight in this situation because Father's unlawful conduct occurred *before* Child was conceived. After learning of Mother's pregnancy, Father voluntarily surrendered to authorities in order to raise Child with Mother upon his release. Although Father's incarceration alone is insufficient to create a ground for TPR, his incarceration does not insulate him from performing his parental duty of visiting Child within his ability.

Father has not visited with Child face-to-face, and the record does not indicate he ever requested DSS to allow Child to visit him. However, Eison testified that she did not believe Child would have been permitted to travel out of state to visit with Father in prison. Father could possibly have had face-to-face visitation if Child was placed with Grandmother; however, Grandmother was required to go through the ICPC process because she did not live in South Carolina. The record indicates there was a delay on DSS's side in beginning the ICPC process. Although the family court first ordered an ICPC home study at the June 19, 2013 merits hearing, the ICPC home study was not submitted until October 29, 2013. However, when Grandmother first received a positive home study in February 2014, Mother had not consented to Child living with Grandparents, and Foster Parents had already filed for adoption. Therefore, we do not penalize Father for his failure to visit with Child face-to-face.

Nevertheless, Father's failure to even attempt to make contact with Child for almost an entire year constitutes clear and convincing evidence that Father willfully failed to visit Child. *See* § 63-7-2570(3) (stating a statutory ground for TPR is met when "[t]he child has lived outside the home of either parent for a period of six months, and during that time the parent has wilfully failed to visit the child"). Despite any inconveniences in visitation due to Father's incarceration, Father's disregard in reaching out to Child for almost an entire year evinces a conscious

indifference to the rights of Child to receive much-needed communication and consortium from Father. This is particularly noteworthy considering Father spent $557 of his commissary funds on phone calls alone during this time. Further, prior to the final family court hearing in July 2015, Father made no attempt to contact Child other than his May 2014 communications.

We find the facts that Father (1) voluntarily started his prison sentence early; (2) voluntarily signed an affidavit acknowledging paternity; and (3) obtained a DNA test to prove paternity relied upon by the court of appeals in its analysis do not rescue Father from a finding that he willfully failed to visit Child. We also find Father's communication with the GAL and his legal filings contesting Foster Parents' adoption to be nothing more than Father participating in the ongoing litigation. Further, we find the relevant actions Father did take were judicially motivated and insufficient to cure his willful failure to visit. *See S.C. Dep't of Soc. Servs. v. Cummings*, 345 S.C. 288, 296, 547 S.E.2d 506, 510–11 (Ct. App. 2001) ("A parent's curative conduct after the initiation of TPR proceedings may be considered by the court on the issue of intent; however, it must be considered in light of the timeliness in which it occurred."); *id.* at 296, 547 S.E.2d at 511 ("Rarely does judicially-motivated repentance, standing alone, warrant a finding of curative conduct. It must be considered together with all the relevant facts and circumstances."). DSS removed Child from Mother's care and placed her with Foster Parents on June 6, 2013. Subsequently, Mother signed a consent for Foster Parents to adopt on November 8, 2013, and Foster Parents filed their private adoption/TPR action on November 19, 2013. Although Father attempted to communicate with Child and inquire about her well-being by writing letters to (1) DSS on May 2, 2014, and (2) his attorney on May 8, 2014, these communications occurred approximately one year after Child was removed from Mother's care and occurred over five months after Foster Parents had filed their adoption/TPR petition. We find it particularly noteworthy that Father's first and only attempts to communicate with Child occurred *after* Foster Parents filed their amended complaint alleging TPR was appropriate pursuant to statutory grounds including Father's abandonment and willful failure to visit Child. We conclude this evidence clearly and convincingly establishes these communications were judicially motivated. We find Father's actions insufficient to be curative of his willful failure to visit Child.

For the foregoing reasons, we hold clear and convincing evidence establishes Father willfully failed to visit Child. Therefore, TPR is warranted on this ground.

## B. Best Interest

The family court determined TPR was in Child's "absolute best interest." The family court noted Father was not a person on whom Child could rely for her permanent care, custody, protection, or security. Because the court of appeals found there was not clear and convincing evidence to support any statutory ground for TPR, it did not address the issue of whether TPR was in Child's best interest. *See* S.C. Code Ann. § 63-7-2570 (Supp. 2017) (providing TPR is appropriate upon finding one or more of twelve statutory grounds is satisfied *and* also finding TPR is in the child's best interest). However, since we find clear and convincing evidence supports more than one statutory ground for TPR, a best interest analysis is necessary. We hold TPR is in Child's best interest.

In a TPR case, the best interest of the child is the paramount consideration. *S.C. Dep't of Soc. Servs. v. Smith*, 343 S.C. 129, 133, 538 S.E.2d 285, 287 (Ct. App. 2000). "The [interest] of the child shall prevail if the child's interest and the parental rights conflict." S.C. Code Ann. § 63-7-2620 (2010). "The purpose of [the TPR statute] is to establish procedures for the reasonable and compassionate [TPR] where children are abused, neglected, or abandoned in order to protect the health and welfare of these children and make them eligible for adoption . . . ." S.C. Code Ann. § 63-7-2510 (2010). "Appellate courts must consider the child's perspective, and not the parent's, as the primary concern when determining whether TPR is appropriate." *S.C. Dep't of Soc. Servs. v. Sarah W.*, 402 S.C. 324, 343, 741 S.E.2d 739, 749–50 (2013).

Viewed from Child's perspective, we find TPR is in Child's best interest. Child was placed in foster care shortly after her birth, and at the time the family court issued the order challenged by Father, she had lived with Foster Parents for over two years. She has now lived with Foster Parents for over four years. Father has never met Child, and no bond has formed between them. *See Charleston Cty. Dep't of Soc. Servs. v. King*, 369 S.C. 96, 104–06, 631 S.E.2d 239, 243–44 (2006) (holding TPR was in the child's best interest because child had bonded with his foster family and did not remember his biological family); *S.C. Dep't of Soc. Servs. v. Cameron N.F.L.*, 403 S.C. 323, 329, 742 S.E.2d 697, 700 (Ct. App. 2013) ("The Supreme Court of South Carolina has considered bonding when determining whether TPR is in a child's best interest."). Father has willfully failed to play a meaningful role in Child's life, despite his ability to write and place phone calls while in prison. It is important to delineate Grandmother's efforts from Father's lack of effort. It was Grandmother who stepped up and provided for Mother during the pregnancy when Mother reached out to her for help—not Father. It was Grandmother who maintained contact with

Child and continued to provide support for Child—not Father. Clearly, Grandmother has shown an interest in Child's well-being; unfortunately, we cannot say the same for Father.

Child has lived with Foster Parents for her entire life, and Grandmother visits with Child regularly. Both Foster Parents and Grandmother want to adopt Child and would provide her with permanency and stability as compared to Father. *See Cameron N.F.L.*, 403 S.C. at 329, 742 S.E.2d at 700 (considering future stability when determining whether TPR is in a child's best interest).

We disagree with DSS's and the GAL's recommendation of relative placement with Grandmother. At the time of the final hearing before the family court, relative placement would have had Grandmother serving as a placeholder for Father until he finished his prison sentence, and the uncertainty of Father's desire and ability to parent weighs heavily against Child's stability and permanency. As noted above, Grandmother admitted in her pleadings that Father—her own son—was not a "capable, suitable, fit, or proper person[] to be granted custody of Child." This is hardly a ringing endorsement of the prospect of a stable and suitable permanent environment for Child should Child be placed with Grandmother. This Court cannot and will not prolong the uncertainty of Child's stability and permanency any longer. *See* S.C. Code Ann. § 63-1-20(D) (2010) ("When children must be permanently removed from their homes, they *shall be placed in adoptive homes* so that they may become members of a family by legal adoption or, absent that possibility, other permanent settings.") (emphasis added). Therefore, we find TPR is in Child's best interest.[10]

## II.   Foster Parents' Standing

Foster Parents argue the court of appeals erred in holding the family court had no authority to determine any adoption issues. We agree.

The court of appeals found the family court concluded Foster Parents did not have standing to file an adoption action. The court of appeals found Foster Parents failed to appeal the family court's determination that they lacked standing to file their adoption petition; therefore, the court of appeals held, this unappealed ruling became

---

[10] Because we hold TPR was appropriate and dispositive of the issue, we decline to address the family court's finding that Father's consent for Child's adoption was unnecessary. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address remaining issues when disposition of a prior issue is dispositive).

the law of the case. DSS and Father both urge this Court to apply this procedural bar in affirming the court of appeals' conclusion. *See Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 573, 743 S.E.2d 778, 785 (2013) ("An unappealed ruling is the law of the case and requires affirmance.").

The parties disagree as to whether the family court's order concluded Foster Parents did not have standing to bring their private adoption action. Regardless of whether the family court held Foster Parents lacked standing to bring their private adoption action—arguably making this unappealed ruling the law of the case—this Court has the power to refuse to allow such a procedural bar from prohibiting our ability to address this issue on appeal because the rights of a minor child are involved. *See Joiner ex rel. Rivas v. Rivas*, 342 S.C. 102, 107, 536 S.E.2d 372, 374 (2000) ("[P]rocedural rules are subservient to the court's duty to zealously guard the rights of minors."); *Galloway v. Galloway*, 249 S.C. 157, 160, 153 S.E.2d 326, 327 (1967) ("The duty to protect the rights of minors has precedence over procedural rules otherwise limiting the scope of review and matters affecting the rights of minors can be considered by this court."). Therefore, because Child's rights are heavily involved, we choose to address the merits of whether Foster Parents have standing to bring their private adoption action.[11]

Regarding the merits, the court of appeals found, under the rationale of *Youngblood v. South Carolina Department of Social Services*, 402 S.C. 311, 741 S.E.2d 515 (2013), Foster Parents did not have standing to file their adoption petition. We disagree, and hold Foster Parents have standing to bring their private adoption action.

"Standing refers to a party's right to make a legal claim or seek judicial enforcement of a duty or right" and is a fundamental prerequisite to instituting an

---

[11] Further, if the family court did hold Foster Parents lacked standing to bring their private adoption action, we find Foster Parents were not aggrieved by the family court's ruling and were not required to appeal its decision. *See* Rule 201, SCACR (providing "[o]nly a party aggrieved by an order, judgment, sentence or decision may appeal"); *Bivens v. Knight*, 254 S.C. 10, 13, 173 S.E.2d 150, 152 (1970) (defining an aggrieved party as "a person who is aggrieved by the judgment or decree when it operates on his rights of property or bears directly upon his interest"). Foster Parents clearly benefited from the family court's ultimate decision. Foster Parents desired to adopt Child, and the family court granted them Child's adoption. Nevertheless, the court of appeals uses the law of the case doctrine to effectively nullify Foster Parents' adoption.

action. *See Michael P. v. Greenville Cty. Dep't of Soc. Servs.*, 385 S.C. 407, 415, 684 S.E.2d 211, 215 (Ct. App. 2009). "As a general rule, to have standing, a litigant must have a personal stake in the subject matter of the litigation." *Ex parte Morris*, 367 S.C. 56, 62, 624 S.E.2d 649, 652 (2006). Standing "may exist by statute, through the principles of constitutional standing, or through the public importance exception." *Youngblood*, 402 S.C. at 317, 741 S.E.2d at 518. Statutory standing exists "when a statute confers a right to sue on a party, and determining whether a statute confers standing is an exercise in statutory interpretation." *Id.*

Adoption proceedings are conducted pursuant to the South Carolina Adoption Act. *See* S.C. Code Ann. §§ 63-9-10 to -2290 (2010 & Supp. 2017). Importantly, section 63-9-60 provides:

> (A)(1) Any South Carolina resident may petition the court to adopt a child.
>
> . . . .
>
> (B) This section does not apply to a child placed by the State Department of Social Services or any agency under contract with the department for purposes of placing that child for adoption.

S.C. Code Ann. § 63-9-60 (2010 & Supp. 2017). Because "the right of adoption in South Carolina is not a natural right but wholly statutory, it must be strictly construed." *Hucks v. Dolan*, 288 S.C. 468, 470, 343 S.E.2d 613, 614 (1986).

This Court recently addressed the issue of a foster parent's standing to bring a private adoption action in *South Carolina Department of Social Services v. Boulware*, 422 S.C. 1, 809 S.E.2d 223 (2018). In *Boulware*, we held the foster parents had standing to pursue a private adoption action pursuant to a plain reading of section 63-9-60 because the foster parents were residents of South Carolina and because, at the time the foster parents commenced their adoption action, the child had not yet been placed for adoption by DSS. *Id.* at 14, 809 S.E.2d at 229. We concluded our interpretation of section 63-9-60 did not produce an absurd result and was appropriate under the overarching policies of the South Carolina Children's Code. *Id.* at 13, 809 S.E.2d at 229.

*Boulware* compels a simple analysis in the instant case. Foster Parents are South Carolina residents and filed their private adoption action on November 19, 2013. At the time Foster Parents filed their private adoption action, Child had not been placed for adoption by DSS—Child was only placed by DSS in Foster Parents'

home for "fostering." Therefore, we hold Foster Parents have statutory standing to bring their private adoption action.

## III.    Adoption

Because we hold the court of appeals erred in not considering the issue of adoption, in the interest of providing much-needed stability and permanency for Child, we will review the family court's decision to grant Child's adoption by Foster Parents. The family court noted both Foster Parents and Grandmother were viable adoptive placements for DSS to have considered.[12] The family court ultimately determined it was in Child's best interest to be adopted by Foster Parents. We agree.

During trial, Dr. Cheryl Fortner-Wood, an expert in the field of psychology, specifically child development and attachment, testified before the family court that Child was "securely attached" to Foster Parents. She believed Child's removal from Foster Parents' home would be traumatic for Child and would more likely than not have permanent implications. Dr. Fortner-Wood opined Child had not spent a sufficient amount of time with Grandmother to develop an "attachment relationship." Dr. Fortner-Wood believed Child's attachment to Foster Parents "trumps biology."

Grandmother believed it was in Child's best interest to be in her home— whether through relative placement or adoption. Grandmother testified she came to all of the DSS scheduled visitations with Child. Grandmother testified she was forty-one years old and had three children of her own. Grandmother stated she had a bachelor's degree in psychology and expressed a desire to become a school counselor. Grandmother explained her household consisted of herself, a twenty-year-old son, and a sixteen-year-old daughter. Grandmother admitted she had moved approximately thirty times since 1990 and explained she was currently living in a three bedroom, one bathroom home. She testified to working several different jobs over the past few years. Grandmother noted she had been married three different times and her third marriage was to Step-Grandfather. Grandmother admitted she allowed Step-Grandfather, who she knew in high school, to move into her house after two months of reconnecting with him online. She testified they were currently separated. Grandmother testified a man that she met online had recently

---

[12] We also note that at the pretrial hearing, DSS stated "that if [Grandmother] and [Foster Parents were] both seeking adoption, then DSS would not oppose the plan of adoption with either of them."

come with her on some of her visitations, but Grandmother denied any romantic involvement with that man.

The family court admitted into evidence "sexually provocative" Facebook pictures of Grandmother's daughter in "suggestive and profane" shirts. Grandmother explained her other son had his GED and had previously experienced depression. Grandmother stated Father (twenty-four years old at the time of the final family court hearing) was first arrested when he was fifteen years old. She explained she pressed charges against Father for an altercation involving her other son. She also noted Father was arrested for stealing and using credit cards when he was sixteen years old, possession of crack cocaine when he was nineteen years old, and was subsequently arrested for a probation violation and a counterfeiting charge. She stated the plan was for Father to live with her after his release from prison. She admitted she alleged in her pleadings that Father was an unfit father; however, she testified she believed he would be an excellent father if given the chance. Grandmother admitted Father has another child with a different woman and that Father does not pay any support to that child.

Grandmother's financial declaration showed she had a monthly net income of $1,640.13, which included the earnings from her two part-time jobs and $500 of child support for her daughter. Grandmother acknowledged her daughter would turn eighteen years old the following year. Grandmother's financial declaration also showed monthly expenses of $1,453. Grandmother testified she had approximately $66,000 in student loan debt she will have to start repaying once she obtains gainful employment. She stated she had spent approximately $15,000 in attorney and expert fees for this case. She testified she was considering opening an in-home daycare if she received custody of Child. Grandmother noted she had the support of family members and Father's release date was November 1, 2016. She testified she had never received any negative ICPC home studies.

Dr. Jane Freeman, a certified adoption investigator, testified that if Child was placed with Grandmother at the time of the final hearing, Grandmother would fall below the poverty guidelines provided by the United States government. She stated Foster Parents, given their level of income and number of people in their home, were above the poverty guidelines. Dr. Freeman "strongly recommended" Foster Parents be approved for Child's adoption.

Tammy Dalsing (Foster Mother) testified she was forty-eight years old and married to Edward Dalsing (Foster Father). Foster Mother noted they had a current foster and adoptive license. She stated a total of ten people lived in their home: her and Foster Father; three biological children (ages twenty-two, twenty, and eighteen);

two adopted children (ages five and four); and three foster children (including Child and her half-sister) (ages two, two, and one). Foster Mother testified she and Foster Father were currently in the process of a contested adoption regarding Child's half-sister. She testified she and Foster Father had both been previously married. Foster Mother testified she and Foster Father met in 1992 and married shortly thereafter. She noted her family started fostering children to help and "give back to the community." Foster Mother testified she, Foster Father, and their children had never been arrested. She testified she wants her children to have a relationship with God and be successful.

Foster Mother testified Foster Father was retired from the military and had been employed at Snyder's-Lance for the past five years. She testified she previously worked as a legal secretary but was currently a "full-time homemaker" and homeschooled all of their school-aged children. She noted they converted a dining room into a playroom/schoolroom. Foster Mother stated she was unable to get approval or permission for Child to have a special helmet to address Child's cranial issue and droopy eye through DSS until she and Foster Father were granted custody of Child. She stated that once they were awarded custody, they were able to pay for the medical care Child needed.

Foster Mother believed adoption by her and Foster Father was in Child's best interest. Foster Mother noted she and Foster Father supported Mother's attempts to complete her treatment plan and had Mother's consent to adopt Child. Foster Mother testified she loved Child and believed it would be "devastating" for Child and the rest of her family if Child were removed from their home. She noted she was open to Mother, Grandmother, and Father having a relationship with Child if Foster Parents were granted Child's adoption.

The GAL testified she believed Child was attached to both Grandmother and Foster Parents. In her report, the GAL stated Child was "doing wonderfully in [Foster Parents'] home and ha[d] bonded with [Foster Parents] and foster siblings." The GAL reported Grandmother was "loving" and "very protective" of Child. She explained Child had bonded with Grandmother during the short periods of time they had spent together. The GAL believed Grandmother financially demonstrated an ability to "meet every day needs." She recommended Child be placed with Grandmother so Father could have the opportunity to know Child. DSS also believed relative placement with Grandmother was in Child's best interest.

"It is the policy of this State to reunite the child with his family in a timely manner, whether or not the child has been placed in the care of the State voluntarily." S.C. Code Ann. § 63-1-20(D) (2010). But, "[w]hen children must be permanently

removed from their homes, they shall be placed in adoptive homes so that they may become members of a family by legal adoption or, absent that possibility, other permanent settings." *Id.* Section 63-7-1700(G) (Supp. 2017) requires DSS to "assess[] the viability of adoption" and to "demonstrate[] that [TPR] is not in the child's best interests" before the family court can award "custody or legal guardianship, or both, to a suitable, fit, and willing relative or nonrelative."

In an adoption proceeding, the best interest of the child is the paramount consideration. *Chandler v. Merrell*, 291 S.C. 227, 228, 353 S.E.2d 135, 136 (1987). In *McCutcheon v. Charleston County Department of Social Services*, 302 S.C. 338, 339, 396 S.E.2d 115, 116 (Ct. App. 1990), paternal grandparents filed a petition for adoption, and DSS requested denial of the petition and TPR. The child's foster parents intervened and petitioned for adoption and TPR. *Id.* The child was placed with foster parents when she was less than four months old, and she had lived with foster parents for approximately two years. *Id.* at 347, 396 S.E.2d at 120. The evidence showed the child was bonded with her foster family. *Id.* Although grandparents' home was not "unsuitable," the court of appeals concluded the child's "best interests would be served by staying with the family she has known as such for nearly all her life." *Id.* The court of appeals noted grandparents were not entitled to any preferences—"[t]heir status, as blood relatives, is but one factor in determining the child's best interests." *Id.*

Importantly, Child has lived with Foster Parents since being removed from Mother's home on June 6, 2013. Foster Parents are the only parent figures Child has known, and Dr. Fortner-Wood, an expert in child development and attachment, testified Child was "securely attached" to Foster Parents and believed Child's removal from Foster Parents' home would be traumatic for her and would have permanent implications. Because Child is strongly bonded with Foster Parents, it is not in her best interest to be removed from their home. Although Grandmother has consistently visited Child, we agree with Dr. Fortner-Wood's assessment that Child has not spent a sufficient amount of time with Grandmother to develop an "attachment relationship."

We find the biological relationship between Grandmother and Child is relevant to this Court's consideration; however, this factor is not determinative. *See Dunn v. Dunn*, 298 S.C. 365, 367–68, 380 S.E.2d 836, 838 (1989) (recognizing the "grandparent-status" is but one of the factors used in determining a child's best interest). We acknowledge and admire Grandmother's strong sense of family and the fact that she will go to extraordinary lengths to preserve and protect her family unit. But, adoption by Foster Parents would not necessarily sever all connections Child has with her biological family. At the time of the final hearing, Foster Parents

were in the middle of a contested adoption proceeding to adopt Child's half-sister. Additionally, Foster Mother testified she was open to Mother, Grandmother, and Father having a relationship with Child if Foster Parents were granted Child's adoption.

Although we do not find Grandmother's home is unsuitable for Child, we do have concerns regarding her ability to serve as Child's adoptive parent. Our concerns focus on Grandmother's prior parenting history, financial situation, and unhealthy relationship with Father. Grandmother's most recent ICPC approval in this Court's record was rescinded because the Virginia ICPC was unable to verify Grandmother's income information. Further, the record does not indicate an adoptive placement home study has ever been performed on Grandmother's home. Nevertheless, even if Grandmother's home is suitable for Child's adoption, we find adoption by Foster Parents is in Child's best interest. *See McCutcheon*, 302 S.C. at 347, 396 S.E.2d at 120 (finding adoption by foster parents was in the child's best interest despite her grandparents' home being suitable). We cannot possibly find it to be in Child's best interest for her to be removed from the only home she has ever known—especially when that home is safe and suitable for Child. The justification for severing this developed attachment relationship simply does not exist under the facts of this case.

Both Foster Parents and Grandmother love Child and would be viable adoptive placements. Foster Parents and Grandmother have dedicated tremendous amounts of time and energy to this litigation and have worked hard to ensure Child's needs have continuously been met. However, after thoroughly considering the evidence in the record and Child's best interest, we conclude Foster Parents' petition to adopt Child should be granted. *See Chandler*, 291 S.C. at 228, 353 S.E.2d at 136 (providing the child's best interest is paramount in an adoption proceeding).

## CONCLUSION

We hold: (1) clear and convincing evidence establishes that Father abandoned and willfully failed to visit Child; (2) TPR is in Child's best interest; and (3) based on the facts of this case, Foster Parents have standing to bring their private adoption action. We also hold the family court properly granted Child's adoption to Foster Parents. Therefore, the court of appeals' decision is **REVERSED**, and the family court's order granting adoption to Foster Parents is reinstated.

**BEATTY, C.J., KITTREDGE, HEARN and FEW, JJ., concur.**