## THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Lukas Stasi and Brittney L. Stasi, Petitioners,

v.

Mallory Sweigart and Matthew Kidwell, Defendants,

Of whom Mallory Sweigart is the Respondent,

In the interest of a minor under the age of eighteen.

Appellate Case No. 2020-000677

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from York County
Thomas Henry White IV, Family Court Judge

---

Opinion No. 28058
Heard June 16, 2021 – Filed September 22, 2021

---

## REVERSED

---

Thomas Franklin McDow IV and Erin K Urquhart, McDow and Urquhart, LLC; Barrett Wesley Martin, Barrett W. Martin, P.A., all of Rock Hill, for Petitioners.

Stephen D. Schusterman, Schusterman Law Firm, of Rock Hill, for Respondent.

**JUSTICE FEW:**  This is an appeal from an order of the family court terminating Mallory Sweigart's parental rights to her nine-year-old daughter.  The court of appeals reversed, finding Mallory had not "wilfully failed to visit the child," the statutory ground for termination alleged in this case.  We granted certiorari to review the court of appeals' decision.  We reverse the court of appeals.

## I.  Facts and Procedural History

The Child was born on September 3, 2012.  Mallory Sweigart—the Child's biological mother[1]—was twenty-five years old when the Child was born.  Brittney Stasi is Mallory's sister, and Lukas Stasi is Brittney's husband.

Mallory suffered from severe mental illness since at least the age of fourteen.  In June 2014, while living in her grandmother's home in Ohio with the Child, Mallory attempted suicide for the first time.  Mallory was hospitalized following the suicide attempt, and her doctors diagnosed her with borderline personality disorder.  Within days, she left Ohio to attend an in-patient rehabilitation center in Florida for thirty days, after which she returned to Ohio to recover.  The Child stayed with the Stasis in Fort Mill, South Carolina, from June 2014 until August 2014.  The Child then returned to Ohio, where she lived with Mallory in a rental home.  On December 1, 2014, Mallory attempted suicide again.  The next day, the Stasis brought the Child back to Fort Mill.  Mallory moved to Florida and began out-patient treatment for her borderline personality disorder.

In January 2015, the Stasis filed an action in family court seeking custody of the Child.  The family court promptly granted the Stasis temporary custody.  Mallory and the Stasis mediated the case and entered into a custody agreement in October 2015, which the family court approved and incorporated into a final custody order.  The custody order provided Mallory visitation with the Child on the second Saturday

---

[1] The Child's biological father is Matthew Kidwell.  Although properly served with the Stasis' Summons and Complaint in this termination proceeding, Matthew did not file responsive pleadings.  At the time of the trial, Matthew lived in Ohio and had seen the Child only one time in her entire life.  The family court terminated Matthew's parental rights, and that ruling was not appealed.

of every month in Fort Mill, with a specific visit for the Child's birthday party in September and an additional visit for Christmas in December. The order placed conditions on visitation, including that Mallory submit to a fingernail drug screen twice a year, attend weekly borderline personality disorder therapy sessions, and not be involved in any "critical event" such as another suicide attempt.

From December 2014 until September 2017—almost three years—Mallory saw the Child only four times. Two of those occurred in August and October 2015 while Mallory was in Fort Mill for court hearings. After the family court signed the final custody order in October 2015 setting monthly visitation, Mallory made only two of the monthly visits—in August and October 2016—until September 2017. During those twenty-two months, Mallory missed twenty-two of the twenty-four opportunities the final custody order gave her to visit the Child. She did not visit the Child for her birthday in 2015 or 2016 and missed the Christmas visits both of those years. There were three lengthy periods during which Mallory did not see the Child at all: from December 2, 2014, until August 7, 2015—eight months; from October 7, 2015, until August 13, 2016—ten months; and from October 1, 2016, until September 9, 2017—eleven months.

When the Stasis first started taking care of the Child, Brittney and Mallory had a strong and loving relationship. While in Florida after her first suicide attempt, Mallory emailed Brittney on July 3, 2014, stating, "I know that we both have a love for each other than cannot be described." She wrote, "Thank you is not even enough to say. I wouldn't want her anywhere else, and I know you all are loving her -- are loving her so much." She concluded the email asking Brittany to "tell Luke, also, I appreciate him loving her and doing all that he does," and, "I love you all."

Beginning in December 2014, however, their relationship began to deteriorate. When Mallory was served with the Stasis' January 2015 complaint seeking custody, she attempted suicide a third time and could not attend the hearing in January 2015 because she was hospitalized. The relationship continued to deteriorate after the final custody order in October 2015, when Mallory claimed the Stasis coerced her into signing the custody agreement. In February 2016, Mallory created a GoFundMe[2] page to raise funds for an attorney. In the description for why she

---

[2] "GoFundMe" is an online crowdfunding resource that allows people to raise money for an individual cause across multiple electronic and social media platforms.

needed the money, Mallory publicly claimed Brittney "has taken illegal custody of my daughter" after "my family bullied me into signing custody papers." She wrote, "I know now that my family lied to me, coerced me, and took my daughter while pretending they wanted to help me." She asked for money because "with proper legal representation, I can quite easily win my daughter's life back."

In April 2016—represented by counsel for the first time—Mallory filed an action seeking to have custody of the Child returned to her. Mallory filed an affidavit in support of the claim and made extreme allegations against Brittney. Mallory wrote that Brittney "had a plot to steal my daughter from me at my worst and darkest time" and accused Brittney of "sexually abusing me at a young age." At the hearing on the claim, Mallory's attorney described the relationship as "very poisoned." The family court dismissed Mallory's action.

In May 2016, someone called the Department of Social Services in York County and accused Brittney of physically and sexually abusing the Child and allowing "predators" in the home. Brittney claims Mallory did it, but Mallory claims she did not.[3] DSS investigated the allegations and concluded they were baseless. At this point, Brittney and Mallory's relationship was outright hostile, and the two completely stopped communicating with each other. Lukas took over all communications with Mallory regarding the Child.

In April 2017, the Stasis filed this action for termination of Mallory's parental rights and adoption of the Child. In November 2018, the family court terminated Mallory's parental rights and granted the adoption. In its order, the family court noted that in the twenty-nine months the Child lived with the Stasis before this proceeding was filed, Mallory visited the Child only four times, including two incidental visits while she was in town for hearings. The family court found by clear and convincing evidence Mallory willfully failed to visit the Child and termination of Mallory's parental rights was in the Child's best interests.

The court of appeals considered the case without oral argument. The court of appeals found the Stasis "did not prove by clear and convincing evidence that [Mallory's] failure to visit was willful" and reversed the termination of Mallory's parental rights

_____

[3] At trial in September 2018, Mallory claimed her friend and employer in Florida is the person who made the call and the accusations.

in an unpublished opinion.  *Stasi v. Sweigart*, Op. No. 2019-UP-383 (S.C. Ct. App. filed Dec. 10, 2019).  We granted the Stasis' petition for a writ of certiorari to review the court of appeals' opinion.

## II.     Termination of Parental Rights

The South Carolina Children's Code addresses termination of parental rights in Chapter 7, Article 7.  *See* S.C. Code Ann. §§ 63-7-2510 to -2620 (2010 & Supp. 2020).  Section 63-7-2510 of the South Carolina Code (2010) provides,

> The purpose of this article is to establish procedures for the reasonable and compassionate termination of parental rights where children are abused, neglected, or abandoned in order to protect the health and welfare of these children and make them eligible for adoption by persons who will provide a suitable home environment and the love and care necessary for a happy, healthful, and productive life.

Section 63-7-2570 of the South Carolina Code (Supp. 2020) provides, "The family court may order the termination of parental rights upon a finding of one or more of the following grounds and a finding that termination is in the best interest of the child."  The statutory ground at issue in this case is, "The child has lived outside the home of either parent for a period of six months, and during that time the parent has wilfully failed to visit the child."  § 63-7-2570(3).

### A.     Willful Failure to Visit

The events that took place—or more importantly, those that did not take place—are not in dispute.  There is no question the Child has not lived with Mallory since December 2, 2014.  There is no question Mallory did not visit the Child on twenty-two of her twenty-four court-ordered visitation dates from October 2015 until September 2017.  There is no question Mallory did not visit the Child for multiple lengthy periods of time, three of which lasted at least eight months.  There is no question Mallory did not visit the Child for her birthday or for Christmas in 2015 or 2016.

The circumstances surrounding these failures are not much in dispute either. Mallory lived in Florida for the legitimate purpose of pursuing treatment for severe

mental illness. Mallory had limited funds and arranging travel to South Carolina was not easy. The relationship between Mallory and Brittney—a loving one as late as July 2014—deteriorated from January 2015 when the Stasis filed the custody action until May 2016 when Mallory accused Brittney of molesting the Child. After that incident, Mallory and Brittney did not speak to each other.

From these undisputed failures by Mallory to visit the Child and the circumstances in which the visits did not occur, we turn to the key question—hotly disputed in this case—whether Mallory "wilfully failed to visit" her daughter. Willfulness "is a question of intent." *S.C. Dep't of Soc. Servs. v. Smith*, 423 S.C. 60, 81, 814 S.E.2d 148, 159 (2018) (quoting *S.C. Dep't of Soc. Servs. v. Broome*, 307 S.C. 48, 52, 413 S.E.2d 835, 838 (1992)). As is always the case, such a question of a parent's intent in the life of a child is difficult to answer. As in all family court appeals, we review substantive decisions like this de novo. *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011).

When events or circumstances are in dispute in a proceeding for termination of parental rights, we require the facts supporting termination be proven by clear and convincing evidence. *Broom v. Jennifer J.*, 403 S.C. 96, 111, 742 S.E.2d 382, 389 (2013) (citing *Richberg v. Dawson*, 278 S.C. 356, 357, 296 S.E.2d 338, 339 (1982)). This standard of proof is required by the Due Process Clause of the Fourteenth Amendment. *See Richberg*, 278 S.C. at 357, 296 S.E.2d at 339 ("It is now established that, before parental rights may be completely and irrevocably severed, the State must show conditions warranting such action by clear and convincing evidence." (citing *Santosky v. Kramer*, 455 U.S. 745, 747-48, 102 S. Ct. 1388, 1391-92, 71 L. Ed. 2d 599, 603 (1982))); *Santosky*, 455 U.S. at 747-48, 102 S. Ct. at 1391-92, 71 L. Ed. 2d at 603 ("Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence."). Answering the question of a mother's intent in failing to visit her child, especially when considering the many difficult circumstances Mallory faced, is more of a judgment call than a finding of specific facts, such as events or circumstances. Nevertheless, due process requires no less of this Court just because the answer to the question is a difficult exercise in judgment. The evidence must be clear and we must be convinced that Mallory "wilfully failed to visit" her daughter and that termination is in her daughter's best interest before we may terminate Mallory's parental rights.

"Our appellate courts have defined 'willful' in a variety of contexts. In each instance, the court has required a showing of a consciousness of wrongdoing in order to prove willfulness." *State v. Garrard*, 390 S.C. 146, 149, 700 S.E.2d 269, 271 (Ct. App. 2010) (citing *Broome*, 307 S.C. at 53, 413 S.E.2d at 839). A parent has the moral and legal duty to care for and act in the best interests of his or her children. The satisfaction of this parental duty can be difficult under the best of circumstances. It becomes all the more difficult when—as addressed by subsections 63-7-2570(3) and (4)—children "live[] outside the home of either parent." The law, therefore, requires such a parent to provide financial support, § 63-7-2570(4), and to "visit the child" when "not prevented" from doing so, § 63-7-2570(3).

When a parent cannot comply with these duties—depending on the circumstances—the failure may be understandable, even unavoidable, and thus not willful. However, when a parent *chooses* not to comply with either of these duties, the intention of that choice may render the failure willful. Thus we have said, "Conduct of the parent which evinces a settled purpose to forego parental duties may fairly be characterized as 'willful' because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent." *Broome*, 307 S.C. at 53, 413 S.E.2d at 839; *see also Garrard*, 390 S.C. at 149, 700 S.E.2d at 271 (stating willfulness requires "a consciousness of wrongdoing").

We readily acknowledge there is considerable mitigating evidence indicating Mallory's failures were understandable, at times unavoidable. Mallory faced logistical, financial, and personal challenges in visiting the Child. Logistically, Mallory lived in Saint Petersburg, Florida, and the Stasis lived in Fort Mill, South Carolina. The cities are 584 miles apart. Subsection 63-7-2570(3) provides, in the context of willfulness, "The distance of the child's placement from the parent's home must be taken into consideration when determining the ability to visit." We have considered that—at times—it was difficult for Mallory to arrange travel for visitation because of the distance.

Financially, Mallory struggled. Although her family helped with finances when she initially moved to Florida, they withdrew financial support sometime in 2015. Mallory was then forced to support herself for the first time. At various times, she worked up to three jobs to support herself and attempt to comply with the conditions on visitation. The "dialectical behavior therapy" sessions for borderline personality disorder cost between $1,600 and $2,000 per month. The drug tests cost approximately $400 each, totaling $800 per year. After paying her bills and the

therapy and testing costs, as Mallory testified, she had "Very little [money left]. Some months, none."

Personally, Mallory suffered—certainly still suffers—from borderline personality disorder and other mental health issues. We understand some of Mallory's bad decisions regarding the Child were attributable to her mental health. During oral argument to this Court, Mallory's attorney focused particularly on Mallory's mental health issues, detailing how her illness affected her behavior throughout this time period. Mallory apparently thought she "graduated" from dialectical behavior therapy in April 2016, and she even testified she believed she was "cured" of borderline personality disorder. At trial, Mallory stated that committing to weekly therapy sessions "changed [her] whole life." When she was better able to cope with her mental illness in 2017, she began to visit the Child more often.

Mallory did not miss every visit in the years leading up to the termination proceeding. She did make two of the court-ordered visits between October 2015 and September 2017. She also made two "incidental visits" with the Child while she was in South Carolina for hearings in August and October 2015. We have considered the fact Mallory made these visits. However, the incidental visits lasted no more than two hours each. Also, Mallory did not make the intentional decision to come to Fort Mill to visit her daughter she had not seen in eight months. Instead, Mallory came to Fort Mill to participate in a status meeting and mediation for the case. *See* § 63-7-2570(3) (providing the family court "may attach little or no weight to incidental visitations"); *Horton v. Vaughn*, 309 S.C. 383, 387, 423 S.E.2d 543, 545 (Ct. App. 1992) ("As used in a TPR statute, 'incidental visitation' means that a parent may not rely upon fortuitous meetings between the parent and a child . . . ."), *overruled on other grounds by Joiner ex rel. Rivas v. Rivas*, 342 S.C. 102, 536 S.E.2d 372 (2000).

We also acknowledge Mallory began to exercise her court-ordered visitation in September 2017—five months after the Stasis filed this action—and did so consistently from December 2017 until the trial in September 2018. *But see Smith*, 423 S.C. at 83, 814 S.E.2d at 160 (holding the parent's actions to cure his willful failure to visit "were judicially motivated"); *S.C. Dep't of Soc. Servs. v. Cummings*, 345 S.C. 288, 296, 547 S.E.2d 506, 510-11 (Ct. App. 2001) ("A parent's curative conduct after the initiation of TPR proceedings may be considered by the court on the issue of intent; however, it must be considered in light of the timeliness in which it occurred.").

In addition, as the court of appeals discussed, there were several months when the Stasis prevented[4] Mallory from visiting because they believed her non-participation in dialectical behavior therapy violated the family court's order, and thus the order required them to prevent visitation. The family court later clarified, however, that Mallory still attended some therapy for her mental health, so her non-participation in "dialectical behavior therapy" specifically was not a violation of the order.[5] The Stasis also prevented her from visiting from November 2016 to February 2017 because Mallory did not get the drug test due in November. While the Stasis did this because Mallory clearly had not complied with the family court's order, Mallory claimed she could not afford the test. There were, therefore, individual opportunities to visit the child that Mallory missed that were understandable, even unavoidable.

Despite this considerable mitigating evidence, we find the record as a whole clearly and convincingly demonstrates Mallory made one conscious and intentional decision after another to not visit the Child on her court-ordered visitation dates. We find Mallory made these decisions knowing she was violating her duties to the Child and with conscious disregard for the rights of the Child. *See Broome*, 307 S.C. at 53, 413 S.E.2d at 839; *Garrard*, 390 S.C. at 149, 700 S.E.2d at 271.

One of the three lengthy periods during which Mallory failed to visit the Child began on December 2, 2014, and lasted until August 7, 2015. During this time, Mallory moved from Ohio to Florida and began therapy for her borderline personality disorder. Although arranging travel to Fort Mill was difficult, multiple family members testified they offered to help Mallory pay for visitation costs. Mallory's grandmother offered to drive Mallory from Florida to Fort Mill and buy her a hotel room so Mallory could see the Child. Mallory told her she "didn't want to do it." The grandmother even bought Mallory a plane ticket from Florida to Fort Mill so

---

[4] Subsection 63-7-2570(3) provides before a court can terminate parental rights based on a willful failure to visit, "it must be shown that the parent was not prevented from visiting by the party having custody or by court order."

[5] The family court held the Stasis in contempt of court for preventing visitation on this basis in October and November 2017. In a separate appeal, the court of appeals held the Stasis did not violate the final custody order and reversed. *See Stasi v. Sweigart*, Op. No. 2018-000044 (S.C. Ct. App. filed Dec. 10, 2019).

Mallory could visit the Child for her birthday in September 2015. Mallory did not visit in September 2015 for the Child's birthday, and Mallory's grandmother testified she does not think Mallory ever used the ticket.

Mallory also did not visit the Child for ten months from October 7, 2015, to August 13, 2016. Mallory testified she had a vehicle she could have driven to Fort Mill as early as November 2015, but Mallory still missed her scheduled December visit and her extra visit for Christmas in 2015. In February 2016, Mallory created a GoFundMe page which raised almost $8,000. Mallory claimed she used $5,000 of the funds to pay the attorney who represented her in the April 2016 action. However, the attorney told the family court he represented Mallory for free. Mallory testified she used the rest of the money from the GoFundMe page to pay for therapy, travel expenses, and a drug test. However, despite having these funds, she did not visit the Child. In May 2016, Mallory traveled to Ohio to visit her brother instead of attending the Child's dance recital, which the Stasis specifically invited Mallory to attend. During this trip, Mallory became so intoxicated one night she walked onto the porch of the wrong house and threw up, prompting the homeowner to call the police. Mallory's mother testified, as to this period of time and others, "Multiple times I offered to drive her, give her money, whatever it was she needed to go and see [the Child]." Clearly, Mallory had the ability to visit the Child during this period, but instead, she chose to prioritize other things over the needs of her daughter.

The third lengthy period in which Mallory did not visit the Child was from October 1, 2016, to September 9, 2017. She missed the scheduled visit for Christmas in December 2016. During this period, Mallory bought a calendar to give to the Child. On the space for the second Saturday of each month—the court-ordered visitation dates—Mallory wrote "Mommy and [daughter]" with hearts surrounding the day. Mallory showed the calendar to the Child during a FaceTime call at the beginning of 2017, thus promising the Child she would visit on these dates. Mallory nevertheless still did not visit the Child until her birthday in September 2017. Mallory gave the Child hope she would visit, and then crushed the hope by not doing so for seven more months.

Initially, it was not Mallory's choice to live so far away from the Child. The family court considered this distance in the final custody order and in its decision not to order child support. The court stated, Mallory "shall not be required to pay child support at this time as [she] will be responsible for the costs associated with her transportation for visitation as well as the cost of her ongoing therapy/treatment."

At the termination trial in November 2018, however, the Child's guardian ad litem testified that in 2015 she found a therapist in Charlotte, North Carolina, similar to Mallory's therapist in Florida. Mallory's mother testified she offered to "get her an apartment there," but Mallory declined. Instead of moving to Charlotte—located less than thirty minutes from her daughter—Mallory told the guardian she chose to stay in Florida. It does not appear anything other than Mallory's own conscious and intentional decisions kept her from moving closer to the Child. *See S.C. Dep't of Soc. Servs. v. Headden*, 354 S.C. 602, 611, 582 S.E.2d 419, 424 (2003) (noting "The distance between Mother and Child in this case was by the Mother's own making").

The court of appeals suggested the Stasis should have forgiven Mallory's non-compliance with the conditions on visitation because she could not afford the costs of compliance. However, the final custody order stated the parties "shall operate under and be bound by the attached Parenting Schedule and Guidelines (Exhibit A)." The guidelines stated Mallory's visitation "shall be suspended" if she did not comply with the conditions. This mandatory language left the Stasis with no discretion. Only the family court—not the Stasis—could "forgive" Mallory's non-compliance. When conditions on visitation cannot reasonably be met, it is not acceptable to ignore the conditions and fail to visit for a longer period of time than it would reasonably take to ask the family court to modify the conditions. Instead of asking for understanding when she chose—for whatever reason—to ignore the conditions, Mallory should have sought to change the conditions. Mallory's actions—or more importantly, her inactions—demonstrate she made repeated conscious and intentional decisions to forego her parental duty to visit the Child.

Further, the conditions in the family court's custody order were reasonable. Enabling a parent to visit under reasonable conditions is quite different from preventing a parent from visiting. *See Matter of M.*, 312 S.C. 248, 250, 439 S.E.2d 857, 859 (Ct. App. 1993) (holding the order requiring the father to participate in psychotherapy as a pre-requisite to visitation did not prevent visitation, "Rather, it outlined a mechanism through which visitation could resume. The father's defiant refusal to meet the reasonable conditions placed on his right to visitation was tantamount to an election not to visit [the child] unless he could do it on his own terms").

Finally, we think it is important to consider the extent to which FaceTime contact should impact our decision. The October 2015 final custody order provided Mallory was "entitled to FaceTime/telephone contact on Tuesdays of each week at 4:00 p.m. for a maximum of thirty minutes." In her brief to the court of appeals, Mallory

argued her FaceTime calls with the Child should be considered as visitation under subsection 63-7-2570(3). The court of appeals acknowledged this argument but noted the argument missed the point of the subsection. The court of appeals wrote, "The question of whether phone calls constitute visitation misses the primary question raised here, which is whether Mother's failure to visit was willful. Attempts to communicate with a child when a parent cannot otherwise visit are always relevant when considering whether the failure to visit was willful."

We agree with the court of appeals. Whether a parent consistently pursues—or often chooses not to pursue—FaceTime or telephone contact can be important evidence on the difficult question of whether the failure to make court-ordered visitation was understandable, or willful. However, FaceTime or telephone contact is not visitation.[6] As the family court judge aptly stated in the November 2018 order, "A parent cannot hug a child or dry a crying child's tears via FaceTime."

Here, Mallory did exercise 50-60% of her scheduled FaceTime calls, which means—of course—she missed 40-50% of them. One would hope a parent who claims she suffers difficulties that keep her from visiting her child, but who nevertheless desires to do so, would exercise all of her permitted FaceTime calls. Mallory, however, offered excuses. She claimed she was not able to call every Tuesday at the scheduled time because she had to work some of those days. This is unpersuasive. Mallory could have arranged a break time with her employer to ensure she could at least speak with the Child every week. She also could have asked the Stasis—or the family court if necessary—to change the scheduled time for the calls to ensure she would not have to interrupt her work schedule. *She* chose not to do either. She also did not exercise her scheduled FaceTime contact for twelve consecutive weeks from March 15, 2017, to May 31, 2017, even after the Stasis filed this termination proceeding in April 2017.

The fact Mallory missed *any* of the FaceTime calls is difficult to understand. The fact she missed almost half of them is convincing evidence her failure to visit was willful. *See Smith*, 423 S.C. at 83, 814 S.E.2d at 160 ("Nevertheless, Father's failure to even attempt to make contact with Child for almost an entire year constitutes clear

---

[6] There may, of course, be circumstances in which in-person visitation is simply not possible, in which case the family court may order virtual visitation such as by FaceTime because it may be the only option.

and convincing evidence that Father willfully failed to visit Child."); *Headden*, 354 S.C. at 611, 582 S.E.2d at 424 (noting "the Mother made little to no effort to maintain a relationship with the Child with letters or phone calls when physical visits were not possible").

As we stated in *Smith*, "Willfulness does not mean that the parent must have some ill-intent towards the child or a conscious desire not to visit; it only means that the parent must not have visited due to [her] own decisions, rather than being prevented from doing so by someone else." 423 S.C. at 81, 814 S.E.2d at 159 (quoting *Broom*, 403 S.C. at 114, 742 S.E.2d at 391). However, a parent who intentionally fails to make one opportunity—even several opportunities—for court-ordered visitation has not necessarily "wilfully failed to visit the child" under subsection 63-7-2570(3), even though one or several failures were intentional. For example, if we consider in isolation Mallory's intentional choice to go to Ohio in May 2016 instead of making her court-ordered visit with the Child and attending the Child's dance recital, and even if we consider Mallory's shocking and drunken behavior while she was in Ohio, that one incident—though clearly purposeful—was not necessarily "willful" under subsection 63-7-2570(3). Willfulness requires real-time consciousness that the failure to visit is wrong, *Garrard*, 390 S.C. at 149, 700 S.E.2d at 271, and "a conscious indifference to the rights of the child to receive support and consortium from the parent," *Broome*, 307 S.C. at 53, 413 S.E.2d at 839.

As we have discussed at length, Mallory's difficult circumstances make some of her failures understandable. No circumstances, however, can change the fact that on most of the occasions Mallory's failure to visit the Child was the result of her own conscious choice made with knowledge she was wrong and knowledge she acted against the interests of her daughter. On most of the occasions, Mallory's failure to visit did not result from the difficulty of her circumstances or the Stasis' effort to comply with the conditions of visitation set forth in the family court's custody order. Rather, on most of the occasions when Mallory failed to visit the child, she acted willfully as the term is used in subsection 63-7-2570(3). *See Broom*, 403 S.C. at 114, 742 S.E.2d at 391 (noting the mother's explanation for the lack of visits—difficulties in scheduling visits—"does not alter the fact that she missed numerous months of visitation when it was clearly possible to schedule at least one visit per month").

Therefore, we hold Mallory's failure to visit the Child was willful.

### B. Best Interest of the Child

When a statutory ground for termination—here, willful failure to visit—is established by clear and convincing evidence, we must determine whether termination is in the best interest of the child. "In a TPR case, the best interest of the child is the paramount consideration." *Smith*, 423 S.C. at 85, 814 S.E.2d at 161 (citing *S.C. Dep't of Soc. Servs. v. Smith*, 343 S.C. 129, 133, 538 S.E.2d 285, 287 (Ct. App. 2000)).

At the time of the trial in 2018, the Child was six years old and had lived with the Stasis since she was two years old. The Stasis' home, including the love and care they gave her, is essentially the only environment the Child has ever known. *See* § 63-7-2510. The Child refers to the Stasis as "mom" and "dad" and to their other children as her brothers and sisters. The Stasis provide the Child with stability. Dr. Cheryl Fortner-Wood, an expert in child development and attachment, testified the Child has developed a secure-attachment relationship with the Stasis in the years the Child has lived with them.

On the contrary, Mallory's role in the Child's life is inconsistent at best, nonexistent at worst, and certainly not stable. Dr. Fortner-Wood testified attachment with others is "based on [the] history of interaction" with the other person. She also stated an eight-hour visitation once a month and weekly phone calls of thirty minutes—much more contact than Mallory and the Child actually had—would not be enough to facilitate a secure-attachment relationship. In fact, we know the Child and Mallory's relationship was very strained. The guardian testified the Child constantly begged the Stasis and the guardian before visits and FaceTime calls not to make her see or talk to Mallory. Dr. Fortner-Wood testified that forcing a child to do something she adamantly does not want to do can "actually have a negative impact on the relationship between the child and the attachment figure." Thus, every time the Child is forced to see or talk to Mallory when she outwardly states she does not want to may hurt her secure relationship with the Stasis. *See Smith*, 423 S.C. at 85, 814 S.E.2d at 161 (considering the lack of bonding between the father and the child in determining the best interest of the child).

It is also notable the Child referred to Mallory as a "liar" on multiple occasions and asked the Stasis and the guardian why Mallory lies to her. The Child's therapist testified the Child expressed concerns about Mallory taking her away from the Stasis. During one of their sessions, the Child told the therapist she was scared to

leave the Stasis and that she would run away if she had to leave them. Resuming visits between Mallory and the Child after three years would only deepen this fear. Most importantly as to Mallory's relationship with the Child—as the guardian testified—Mallory has not "placed [the Child] as a priority" in her life.

We are also concerned about Mallory's continuing mental health issues. During oral argument to this Court, Mallory's attorney confirmed Mallory still suffers from "significant mental health issues." We certainly do not fault Mallory for her mental health issues, and we commend her efforts in seeking professional help. However, Mallory rarely visited the Child when her mental health was at its best, and even then, her relationship with the Child was poor. If Mallory's mental illness is still a problem—or worse is deteriorating—then resuming visits is not in the Child's best interest.

"Appellate courts must consider the child's perspective, and not the parent's, as the primary concern when determining whether TPR is appropriate." *Smith*, 423 S.C. at 85, 814 S.E.2d at 161 (quoting *S.C. Dep't of Soc. Servs. v. Sarah W.*, 402 S.C. 324, 343, 741 S.E.2d 739, 749-50 (2013)). The Child is now nine years old. She has lived with the Stasis since 2014 and has not seen or spoken to Mallory since the family court terminated Mallory's rights in 2018. We hold it is in the Child's best interest to terminate Mallory's parental rights.

We pause here to comment on oral argument. Technically, neither due process nor any other provision of law requires oral argument in a given case. Each judge or appellate panel is entitled to make the decision in each case whether oral argument would be helpful. *See* Rule 215, SCACR ("The appellate court may decide any case without oral argument if it determines that oral argument would not aid the court in resolving the issues."). In this case, counsel for the Stasis filed a written request for oral argument at the court of appeals. The court denied the request. On certiorari in this case, this Court—individually and collectively—found oral argument to be very helpful. The question whether Mallory's repeated failures to visit the Child were understandable, even unavoidable, or whether they were willful, has not been an easy judgment call. From our perspective, oral argument was warranted in this complicated and difficult case.

### III. Conclusion

We find by the required clear and convincing standard of proof that Mallory's failure to visit the Child was willful and that termination of Mallory's parental rights is in the Child's best interest. Therefore, we reverse the court of appeals and reinstate the family court's order terminating Mallory's parental rights and granting the Stasis' adoption of the Child.

**REVERSED.**

**BEATTY, C.J., KITTREDGE, HEARN and JAMES, JJ., concur.**